[Cite as *Luckoski v. Allstate Ins. Co.*, 2013-Ohio-5460.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

RICHARD LUCKOSKI, et al.                    :

    Plaintiffs-Appellants                    :          C.A. CASE NO.    25621

v.                                                      :          T.C. NO.    08CV7317

ALLSTATE INSURANCE CO., et al.        :          (Civil appeal from
                                                                        Common Pleas Court)

    Defendants-Appellees                    :

                                                                 :

· · · · · · · · · ·

# **O P I N I O N**

Rendered on the ____13th____ day of _____December_____, 2013.

· · · · · · · · · ·

TERRY L. LEWIS, Atty. Reg. No. 0010324, 10 W. Second Street, Suite 1100, Dayton, Ohio 45402
    Attorney for Plaintiffs-Appellants

CHARLES SLICER, SR., Atty. Reg. No. 0015555, 111 W. First Street, Suite 518, Dayton, Ohio 45402
    Attorney for Defendants-Appellees

· · · · · · · · · ·

DONOVAN, J.

    **{¶ 1}**   This matter is before the Court on the Notice of Appeal of Richard and

Brenda Luckoski, filed February 8, 2013. On December 7, 2012, the trial court granted judgment in favor of the Luckoskis in the amount of $32,088.93 against McGarvey Construction, Inc. ("M. Construction"); dismissed the counterclaim of John McGarvey ("McGarvey") and M. Construction; and ordered McGarvey and M. Construction to remove a lien they placed on the Luckoskis' property. The issue of the Luckoskis' demand for attorney fees was deferred; following a subsequent hearing, the trial court awarded attorney fees in the amount of $34,522.71. The Luckoskis' notice of appeal provides that they "appeal the decision of the Court as it pertains to the liability of Defendant John McGarvey." No response was filed to the Luckoskis' brief.

{¶ 2} The Luckoskis filed a complaint against McGarvey, M. Construction, and Allstate Insurance Co. ("Allstate") on August 8, 2008, alleging that they contracted with Allstate for homeowners insurance for their residence at 221 Knox Avenue. According to the complaint, a fire damaged the Luckoskis' home and personal property on August 10, 2007. They alleged that Allstate agents Rick Laufer and Julie Finley subsequently met with them at their residence, accompanied by McGarvey, whom Allstate allegedly contacted without the Luckoskis' knowledge or consent. The complaint alleges that M. Construction is owned and operated by McGarvey and "does not have an established fixed location in Ohio, other than the residence of its primary shareholder and where services are not provided or exhibited for sale."

{¶ 3} The Luckoskis alleged that McGarvey improperly placed a tarp on their roof, "which resulted in further damage to their property due to rain." According to the complaint, after being informed by Allstate that it intended to employ McGarvey to complete

the renovation of their home, "Brenda Luckoski informed the agents of Defendant Allstate that they did not wish to utilize Defendant McGarvey." The Luckoskis averred that Allstate agents attested to McGarvey's qualifications, and that the Luckoskis relied upon the representations and "felt that they were required to utilize" his services.

{¶ 4} Alleging that "little repair work was done" on the residence from August 13, 2007 through August 27, 2007, and having received repeated complaints from neighbors that "McGarvey's employees were doing little if any work," the Luckoskis averred that Richard Luckoski "passed this information on to" Allstate's agents. According to the complaint, "Allstate also brought in another representative, Jenetta Johnson," to serve as "an additional liaison" between Allstate and the Luckoskis.

{¶ 5} According to the complaint, on August 27, 2007, Richard Luckoski contacted Johnson and Laufer to request that McGarvey "be removed from the premises." The Luckoskis averred that Richard "was informed by both individuals that this was not possible as they had a contract" with McGarvey, and that "he performed too much work for them to terminate him." After August 27, 2007, the Luckoskis averred that they "continually" contacted Laufer, Finley and/or Johnson and "repeatedly informed them that the work being performed by" McGarvey "was unsatisfactory and was not being done in a workmanlike manner and requested" McGarvey's removal from the premises. The Luckoskis averred that Allstate refused to remove McGarvey.

{¶ 6} The complaint provides as follows:

Over the next few months the Plaintiffs continued to request Defendant McGarvey's removal. Plaintiffs informed Defendant Allstate that

Defendant McGarvey had damaged the door leading to their deck, had damaged their deck, had installed flooring that was not level, had improperly installed plumbing, had installed ceilings that were slanted, had improperly installed windows and had removed cabinets that were not damaged and converted them to his own use.  Agents for Defendant Allstate did visit the home and acknowledged the poor workmanship of Defendant McGarvey on several occasions and provided the Plaintiffs' [sic] with money deducted from their account to redo the work performed by Defendant McGarvey or requested that Defendant McGarvey provide a refund to the Plaintiffs so that the Plaintiffs could arrange for their own contractors to repair or complete the work that was to be done by Defendant McGarvey.

**{¶ 7}**    The complaint provides that on an unknown date, Allstate, through its agents, "insisted that the Plaintiffs execute a contract" with McGarvey, a copy of which is attached to the complaint.  According to the Luckoskis, the contract "violates the Ohio Consumer Sales Practices Act and the Ohio Home Solicitation Act." Specifically, the Luckoskis averred as follows:

> Said Contract contains no specific price or estimate, no statement that the Plaintiffs have the right to receive a specific price or estimate, no specific indication of the work which is to be performed by the contractor, it does not inform the Plaintiffs of their right to a three day cancellation, there is no indication that the contractor intended to utilize independent contractors to perform the work, no specific warranty was provided and no explanation as to

the extent of the alleged thirty six month warranty.

{¶ 8}  According to the Luckoskis, on October 1, 2007, another attempt to have McGarvey removed from the premises was unsuccessful as an Allstate agent "stated that [McGarvey] was a licensed contractor and they could not terminate him."  The Luckoskis asserted that they also learned that McGarvey "was utilizing subcontractors, whose names and addresses were not revealed" to them. The Luckoskis asserted that McGarvey "did not remove any damaged furniture or appliances" until November 1, and 2, 2007, that he removed the kitchen cabinets on November 5, 2007, and that he performed no repair work on the home prior to November 5, 2007.  According to the Luckoskis, the cost of the new kitchen cabinets "was deducted from the cost for the restoration."

{¶ 9}  The Luckoskis averred that McGarvey was eventually removed from the home   at their request on January 4, 2008, and that they "either completed much of the work on the home themselves or contracted with other individuals to complete the work."  They averred that Allstate failed to compensate them for the expenses they incurred with respect to the work performed by McGarvey. They further averred that Allstate "paid directly" to McGarvey, without their consent or approval, funds requested by McGarvey, "notwithstanding that much of [McGarvey's] work had to be redone" by the Luckoskis or other contractors hired by them.   The Luckoskis averred that Allstate deducted the payments made to Luckoski from funds owed to them pursuant to their policy, thereby denying them "sufficient funds to complete the restoration of their home."   Finally, they averred that as a direct and proximate result of the agreements between Allstate, McGarvey and M. Construction, "improper workmanship, numerous violations of the Ohio Consumer Sales

Practices Act, and Ohio Solicitation Act, and breach of the contract set forth above," they were damaged in excess of $25,000.00. The Luckoskis asserted claims for breach of contract and breach of fiduciary duty against Allstate. They asserted claims of violations of the Ohio Home Sales Solicitation Act ("OHSSA") and the Ohio Consumer Sales Practices Act ("OCSPA"), as well as breach of contract against McGarvey and M.Construction.

{¶ 10} In their December 15, 2008 answer and counterclaim, McGarvey and M. Construction stated a cause of action against the Luckoskis "for services rendered." They asserted that M. Construction entered into written agreements with Richard Luckoski on August 15, 2007 and December 6, 2007, for the reconstruction and remodeling of their residence. According to McGarvey and M. Construction, pursuant to the written agreement of August 15, 2007, "the cost to complete the remodeling and construction work was described in an estimate/insurance claim #0103957734 from a fire loss," and the agreement further "provided that additional work may be needed after review of scope and damages and completion may be extended." McGarvey and M. Construction further stated that M. Construction "completed additional work in construction which was not covered by said insurance loss, which was authorized" by the Luckoskis, "in an amount of $7,817.33." McGarvey and M. Construction further alleged claims of defamation and slander against the Luckoskis.

{¶ 11} On June 3, 2009, the trial court granted the Luckoskis' motion to dismiss McGarvey's and M. Construction's counterclaim for defamation. On October 26, 2010, the Luckoskis filed a motion for summary judgment, attached to which are the affidavits of the the Luckoskis and their counsel. The Luckoskis sought summary judgment on the

following issues: that the actions of McGarvey and M. Construction are within the scope of the OCSPA and the OHSSA, that McGarvey and M. Construciton have committed multiple violations thereof, and that the Luckoskis are entitled to treble damages and attorney fees.

{¶ 12} Allstate filed a motion for summary judgment on November 23, 2010, in which it asserted that it did not breach its contract with the Luckoskis, that it did not owe them a fiduciary duty, and that the OCSPA and the OHSSA do not apply to it as the Luckoskis' insurer. Allstate also filed the affidavits of Laufer and Finley.

{¶ 13} McGarvey and M. Construction filed a motion for summary judgment on December 9, 2010. They asserted that McGarvey did not violate the OCSPA, and that the OHSSA does not apply to the transaction between the Luckoskis and McGarvey. McGarvey's affidavit is attached to the motion.

{¶ 14} On January 17, 2011, the Luckoskis filed a motion to strike all references in McGarvey's and M. Construction's motion for summary judgment "to the alleged contract which Defendant McGarvey referred to in his motion for summary judgment." A footnote to the motion provides as follows:

> Plaintiff's counsel came into possession of a document which was subsequently labeled as Plaintiffs' Exhibit 1. This document is unexecuted, contains five pages, and was apparently printed on October 29, 2007. Plaintiffs had the document marked as Plaintiffs' Exhibit 1 and inquired about it in the deposition of Defendant McGarvey to determine the purpose as to why Defendant McGarvey would create this document, and why it was printed by Defendant McGarvey on October 29, 2007. * * * Defendant

McGarvey denied that this was similar to the original contract, admitted that he had created it on or about October 29, 2007 (two months after the original contract was executed) but had no explanation as to why he created the document. In addition * * * Defendant McGarvey subsequently admitted that the document was not similar to the original contract and that he had no discussions with Plaintiffs concerning their right of cancellation as indicated on the last three pages of Plaintiffs' Exhibit 1 and as claimed by Defendant McGarvey in his Motion.

{¶ 15} On February 15, 2011, a Stipulation of Dismissal with Prejudice of Claims against Defendant Allstate Insurance Company was issued as the result of a settlement.

{¶ 16} On September 16, 2011, the trial court issued a decision overruling the Luckoskis', and McGarvey's and M. Construction's, motions for summary judgment and overruling the Luckoskis' motion to strike.

{¶ 17} A trial to the bench was held on October 23-25, 2012, and the parties filed post-trial briefs. In its Decision of December 7, 2012, the trial court noted that there "are two contracts involved in the Luckoskis' claim against McGarvey: an 'emergency work authorization' (Pl. Ex. 41) and a 'contractor agreement' (Pl.Ex. 42)." The court noted that a "follow-up contract (Pl.Ex. 40)" was executed on December 6, 2007.

{¶ 18} Regarding the Luckoskis' claims pursuant to the OHSSA, R.C. 1345.21 et seq., the court determined that the above contracts are not subject to the OHSSA, reasoning as follows:

McGarvey did not solicit the Luckoskis to do the emergency services

to secure their home. He was dispatched by Alacrity[1] to do so. * * *

Nor does the evidence bring the "contractor agreement" within the scope of the HSSA. Richard Laufer, the Allstate adjustor, told Richard Luckoski that Allstate had a panel of "preferred contractors", which included McGarvey, whose work was guaranteed, but that he was free to use any contractor of his choosing. McGarvey verified Laufer's advice to Richard Luckoski and stated he did not solicit his restoration business. McGarvey had been involved in securing the home after the fire and Richard Luckoski elected to have him do the restoration work. * * *

{¶ 19} Regarding the Luckoskis' claims pursuant to the OCSPA, the trial court determined as follows:

Although counsel have not cited a case on all fours with the facts of this case, the Court concludes that McGarvey's undertaking was a "sale . . . of . . . a service . . . to an individual for purposes that are primarily personal, family, or household . . ." R.C. 1345.01(A).

There can be no doubt that McGarvey's performance under the contract to restore the Luckoskis' home was deficient in many respects and that he was dismissed from the job when it was, at best, 50% complete. The Luckoskis undertook the completion of the restoration, incurring the following expenses:

---

[1]Alacrity, according to McGarvey's testimony at trial, is a "liaison between the insurance company and the contractors."

| | |
|---|---|
| Roofing | $6,590 |
| Dumpsters | $450 |
| Siding - house | $3,200 |
| Siding - garage | $1,700 |
| Flooring | $7,691.18 |
| Drywall | $8,854.25 |
| Paint | $209.16 |
| Electrical | $700 |
| Air Conditioner | $1,708 |
| Windows | $4,156 |
| Doors | $1,991 |
| Lowes | $6,427.03 |
| Home Depot | <u>$6,615.14</u> |
| | $50,291.76 |

Richard Luckoski testified that he and his family worked approximately 3,500 hours once McGarvey was off the job and they took over the restoration effort. The Court accepts the approximation of time spent. The Court rejects Mr. Luckoski's across the board valuation of time of $10/hour and instead multiplies 3,500 by $7.00, the 2008 Ohio minimum wage: $24,500.

Finally, the Court awards the Luckoskis $5,000 for their frustration, aggravation, inconvenience, and upset. Their total damages thus come to

$79,791.76.

The Luckoskis have received $59,878.41 in insurance proceeds, and a $717.04 refund from McGarvey. * * * They also received $8,500 in compensatory damages from Allstate. These amounts total $69,095.45 and must be deducted from $79,791.76 for a total net damage amount of $10,696.31.

The evidence established the following CSPA violations which require trebling these damages:

1) McGarvey failed to provide the Luckoskis with a written estimate at the time of the initial face to face contact, prior to any restoration work being done.

2) The contract did not contain a statement that the Luckoskis were entitled to a written, oral, or no estimate.

3) The contract did not contain a reasonable completion date.

4) The contract did not contain a statement of the services to be rendered or an itemization of the repairs to be made.

5) McGarvey failed to inform the Luckoskis that he was employing subcontractors and failed to identify them.

6) McGarvey breached his contract with the Luckoskis.

Accordingly, the Luckoskis are entitled to an award of damages of $32,088.93.

{¶ 20} Regarding McGarvey's individual liability as the sole shareholder of M.

Construction, the trial court noted the three prong test for piercing the corporate veil as set forth in *Belvedere Condominium Unit Owners' Assoc. v. R.E. Roark Cos., Inc* ., 67 Ohio St.3d 274, 617 N.E.2d 1075 (1993), as modified by *Dombroski v. Wellpoint, Inc.,* 119 Ohio St.3d 506, 2008-Ohio-4827, 895 N.E.2d 538, reasoning as follows:

The Supreme Court of Ohio has articulated the three prong test for piercing the corporate veil in [*Belevedere*] as follows:

The corporate form may be disregarded and individual shareholders held liable for wrongs committed by the corporation when (1) control over the corporation by those to be held liable was so complete that the corporation has [no] separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

The second prong of the test was modified in [*Dombroski*]:

Accordingly we hold that to fulfill the second prong of the *Belvedere* test for piercing the corporate veil, the plaintiff must demonstrate that the defendant shareholder exercised control over the corporation in such a manner as to commit fraud, an illegal act, or a similarly unlawful act. Courts

should apply this limited expansion cautiously toward the goal of piercing the corporate veil only in instances of extreme shareholder misconduct. The first and third prongs of the *Belevedere* test are not affected by this ruling and must still be met for a piercing claim to succeed.

**{¶ 21}** The court then noted that a "number of appellate cases address holding corporate officers personally liable for CSPA violations." It further quoted a footnote, in *Grayson v. Cadillac Builders, Inc*., 8th Dist. Cuyahoga No. 68551, 1995 WL 546916, fn. 1 (Sept. 14, 1995), which the court noted "is cited in later cases," as follows:

The Consumer Sales Practices Act does not change the existing common law of tort, nor does it change the common law rule with respect to piercing the corporate veil. A corporate officer may not be held liable merely by virtue of his status as a corporate officer. It does, however, create a tort which imposes personal liability upon corporate officers for violations of the act performed by them in their corporate capacities. See, also, Roberts and Martz, Consumerism Comes of Age: Treble Damages and Attorney Fees in Consumer Transactions-The Ohio Consumer Sales Practices Act (1981), 42 Ohio St.L.J. 927, 932-933.

**{¶ 22}** The court's analysis continued as follows:

Notwithstanding the pronouncement that the CSPA changes neither

the common law of tort nor of piercing the corporate veil, the emphasized language appears to have suggested to some that CSPA violations, alone, are sufficient to impose individual liability.

The Court rejects that notion. The law review article quoted in the *Grayson* footnote states in part as follows:

> The act does not purpose to change the existing common law of tort, and its definition of supplier as anyone who engages in effecting or soliciting consumer transactions, whether or not they deal directly with the consumer, would appear to include corporate officers. Corporate officers are presumably liable for violations of the Consumer Sales Practices Act performed by them in their corporate capacities because the commission of an unfair and deceptive act has been deemed to be a tort. Otherwise, individual corporate officers could engage in proscribed activities with impunity and thus frustrate the purposes of the Act. A corporate entity may be disregarded when the entity is an implement for avoiding a clear legislative purpose and when not to do so will defeat public convenience, justify a wrong, or protect against fraud. Also, under the common law of agency, a principal is liable for those actions of an agent which are within the agent's scope of authority and which violate the Consumer

Sales Practices Act.

The only case cited in the law review article for the statement " . . . the commission of an unfair and deceptive act has been deemed to be a tort[]" is *Quality Carpet Co*[.] *v. Brown* (Franklin CP) 1997 Ohio Misc. LEXIS 125 which states:

> The object sought to be attained by the Consumer Sales Practices Act is the prevention of deceptive and unconscionable sales practices. It is clear that a corporate entity may be disregarded where the entity is an implement for avoiding a clear legislative purpose and where not to do so will defeat public convenience, justify a wrong, or protect against fraud.
>
> Where important principles of public policy have been violated, the courts will pierce the corporate veil and determine the real identity of the actor behind it. The doctrine is to prevent an individual from doing injury and then escaping the consequences by shielding his responsibility behind a corporate body. * * *

In view of the foregoing, the Court is of the view that the CSPA did not create a new tort comprised of CSPA violations but, rather, CSPA violations by corporate officers should be measured against the veil piercing criteria of *Belevedere* and *Dombroski* which, in the Court's judgment,

preclude piercing the corporate veil in this case. While there is no question that the evidence establishes the first prong of the veil piercing test, McGarvey's violations of the CSPA do not represent the types of "exceptional wrong(s) that piercing the corporate veil is designed to remedy." *Dombroski,* paragraph 30.

Although the Court agrees that McGarvey could have complied with the CSPA, circumstances made compliance difficult, e[.]g. the estimate was in Allstate's hands, not McGarvey's; Alacrity wanted McGarvey to proceed with the restoration work as soon as possible, notwithstanding that the estimate was not completed. In short, McGarvey's CSPA violations strike the Court as sins of omission, not calculated to take advantage of the Luckoskis. Compare McGarvey's conduct with that of John Kenley in *State ex rel*[.] *Fischer v. Warren Star Theater,* 84 Ohio App3d 435 (Trumbull App. 1992).

Accordingly, judgment in favor of the Luckoskis will be against McGarvey Construction, Inc., only.

**{¶ 23}** Regarding the counterclaim of McGarvey Construction for services rendered, the court determined that the original contract of August 15, 2007, and the follow-up contract of December 6, 2007, contained specific provisions requiring that any change orders to either contract be in writing and signed by the owner and contractor, and the court concluded that "the Luckoskis never signed any change orders. The $6,745.85 component of the counterclaim would have necessarily been the subject of change orders

because McGarvey's contractual undertaking was to repair fire damage. Because no change orders were signed by the Luckoskis for this work, McGarvey cannot recover for this work." The court noted that, "[a]s it pertains to the window, the evidence is insufficient to support recovery." The court dismissed the counterclaim and ordered McGarvey and McGarvey Construction to remove a lien they previously placed on the Luckoskis' residence on April 24, 2008, in the amount of $9,135.84.

{¶ 24} The Luckoskis assert four assignments of error herein. Their first assigned error, with subparts, is as follows:

"THE TRIAL COURT ERRED IN GRANTING A JUDGMENT ONLY AGAINST THE APPELLEE CORPORATION AND NOT AGAINST THE STOCKHOLDER, OFFICER AND EMPLOYEE WHO COMMITTED THE STATUTORY VIOLATIONS."

"I. A Stockholder, Officer Or Employee Who Participates Or Acquiesces In A Violation Of The Ohio Consumer Sales Practices Act Is Individually Liable."

"II. A Defendant May Not Raise A New Defense At Trial Without Prior Notice and Without Amending The Pleadings."

"III. Defendant's Intent With Respect To Violations Of The Ohio Consumer Sales Practices Act Is Not Relevant."

{¶ 25} The OCSPA is set forth in R.C. 1345.01 et seq., and it prohibits unfair, deceptive, and unconscionable acts or practices in connection with consumer transactions. R.C. 1345.02 and 1345.03. "'Consumer transaction' means a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to

supply any of these things." R.C. 1345.01(A). "'Supplier' means a seller, lessor, assignor, franchisor, or other person engaged in the business of effecting or soliciting consumer transactions, whether or not the person deals directly with the consumer." R.C. 1345.01(C). "'Consumer' means a person who engages in a consumer transaction with a supplier." R.C. 1345.01(D).

{¶ 26} Pursuant to R.C. 1345.05(B)(2), the attorney general may adopt substantive rules defining acts which violate R.C. 1345.02. Ohio Adm. Code 109:4-3-05 provides in part as follows:

> (A) It shall be a deceptive act or practice in connection with a consumer transaction involving the performance of either repairs or any service where the anticipated cost exceeds twenty-five dollars and there has been face to face contact between the consumer or the consumer's representative and the supplier or the supplier's representative, prior to the commencement of the repair or service for a supplier to:
>
> (1) Fail, at the time of the initial face to face contact and prior to the commencement of any repair or service, to provide the consumer with a form which indicates the date, the identity of the supplier, the consumer's name and telephone number, the reasonably anticipated completion date and, if requested by the consumer, the anticipated cost of the repair or service. The form shall also clearly and conspicuously contain the following disclosures in substantially the following language:
>
> "Estimate

You have the right to an estimate if the expected cost of repairs or services will be more than twenty-five dollars.   Initial your choice:

____ written estimate


____ oral estimate


____no estimate"

* * *

(B) It shall be a deceptive act or practice in connection with a consumer transaction involving the performance of either a repair or service where the anticipated cost exceeds twenty-five dollars and where any portion of the repair or service is to be performed at the consumer's residence, for a supplier to fail to orally inform the consumer at the initial face to face contact and prior to the commencement of any repair or service, of the consumer's right to receive a written or oral estimate and to provide the consumer with a form which conforms to the requirements of paragraph (A)(1) of this rule. * * *

* * *

(D) In any consumer transaction involving the performance of any repair or service it shall be a deceptive act or practice for a supplier to:

* * *

(12) Fail to provide the consumer with a written itemized list of

repairs performed or services rendered, including a list of parts or materials and a statement of whether they are used, remanufactured, or rebuilt, if not new, and the cost thereof to the consumer, the amount charged for labor, and the identity of the individual performing the repair or service;

* * *

(16) Fail to disclose to the consumer prior to the commencement of any repair or service, that any part of the repair or service will be performed by a person other than the supplier or his employees if the supplier disclaims any warranty of the repair or service performed by that person, the nature of the repair or service which the person will perform, and if requested by the consumer, the identity of that person;. . . .

{¶ 27} We initially note that the record before us supports the trial court's determination regarding the six enumerated violations of the OCSPA. We note that Plaintiffs' Exhibit 41 is the Emergency Work Authorization, dated August 10, 2007, executed by Richard Luckosksi, pursuant to which Allstate authorized M. Construction to perform emergency services after the fire. Plaintiffs' Exhibit 42 is the August 15, 2007 Contractor Agreement executed by Richard Luckoski and McGarvey, on behalf of McGarvey Construction, and Plaintiffs' Exhibit 40 is the December 6, 2007 contract executed by Richard Luckoski and McGarvey, on behalf of McGarvey Construction.

{¶ 28} This Court has previously noted that "a corporate officer is individually liable for his acts which violate the Consumer Sales Practices Act." *Siemon v. Combs*, 2d Dist. Montgomery No. 14248, 1994 WL 237483 (June 3, 1994), citing *Warren Star Theater,*

84 Ohio App.3d at 443, which the court found to be distinguishable from the matter herein.

{¶ 29} In *Warren Star Theater*, John Kenley was "one of only two trustees, the president, the treasurer, the acting secretary and the general manager of the Warren Star Theater. In such capacity, he negotiated contracts with performers, set salaries for employees, entered into advertising contracts and rental agreements, and generally did whatever was necessary to produce the theatrical performances." *Id.*, 437. In a suit filed by the Ohio Attorney General pursuant to the OCSPA, the complaint alleged against Kenly and the theater the following three counts:

(1) that the defendants committed unfair and deceptive acts or practices in violation of R.C. 1345.02(A) and Ohio Adm. Code 109:4-3-09(A)(2)(b) by accepting money from consumers for specific musical performances and then failing to make full refunds when the shows were cancelled; (2) that the defendants knowingly took advantage of consumers' inability to protect themselves by failing to inform consumers of the precarious financial condition of the theater and substantial likelihood that the scheduled performances would be cancelled, in violation of R.C. 1345.02 and 1345.03; and (3) that the defendants sold tickets to consumers after July 12, 1987, knowing no contract with Bobby Vinton existed, which was an unconscionable act in violation of R.C. 1345.03(B)(3). *Id.*, 438.

{¶ 30} The referee found that Kenly engaged in unconscionable acts and practices, but concluded that he "could not be held personally liable because of the protection afforded by R.C. 1702.55(B)." *Id.*, 443. The State filed a cross-appeal, and the Eleventh District

determined that "the referee's conclusion that Kenley engaged in unconscionable acts and practices is amply supported by the record." *Id.* The court further found as follows:

> It has been held that a corporate officer is individually liable for his acts which violate the Consumer Sales Practices Act as set forth in R.C. 1345. *Quality Carpet Co. v. Brown* (C.P. 1977), 6 O.O.3d 185; *Gayer v. Ohio Business Trading Assn.* (July 7, 1988), Cuyahoga App. No. 54892, unreported, 1988 WL 87629. Thus, it is clear that Kenley should be held personally liable for his actions which violated the Consumer Sales Practices Act. * * *. *Id.*

Finally, the court concluded that R.C. 1702.55(B) did not protect Kenley, since "it does not apply to corporate officers, nor does it address acts which violate the Consumer Sales Practices Act." *Id., 444.*

{¶ 31} In *Gayer*, upon which the *Warren Star Theater* court relied, the Gayers alleged violations of the OCSPA against the Ohio Business Trading Association ("OBTA") and its president, John Zawislan, alleging that Zawislan misrepresented to them that their home would be sided with aluminum siding. *Gayer*, 1988 WL 87629, * 1. "The referee found there was basis in fact for Zawislan's representations since various siding groups belonged to OBTA. However, the referee also found plaintiffs were damaged by Zawislan's representation that the home would be sided with aluminum siding and the defendant corporation was bound by those representations." *Id.*, *1. The referee awarded judgment against OBTA and in favor of Zawasian personally. *Id.* The Gayers' objections were overruled, and the Eighth District determined on appeal as follows:

In the case *sub judice*, the findings of the referee adopted by the trial court specifically state defendant Zawislan did not make any false representations to the plaintiffs. However, the referee's findings also indicate plaintiffs were damaged in relying on the representation that their home would be sided with aluminum siding after the insulation was installed. The trial court adopted the referee's findings that the corporation was liable under the Consumer Sales Practices Act. However, if the corporation is liable then so is its president, defendant Zawislan, who was the individual who made all representations *sub judice* to the plaintiffs. Necessarily, under the circumstances *sub judice*, if the corporation committed a deceptive sales act as a result of the these representations, then so did defendant Zawislan who was the corporation's president and who was the individual who made the representations. Therefore, Zawislan is personally liable to plaintiffs. *Id.*, *2.

{¶ 32} In contrast, in *Grayson,* also cited by the trial court, the Graysons, after being contacted by a telemarketing representative of Cadillac Builders, Inc. ("Cadillac"), entered into a contract for the removal of their porch and the building of a new porch on their home. *Id.*, * 1. Sub-contractors hired by Cadillac "installed a new porch in one day." *Id.* The Graysons immediately contacted Kenneth Peizer, the president and sole shareholder of Cadillac, regarding the poor workmanship and quality of the improvements. *Id.* Peizer "came to their home and sent someone to repair the porch within a few days." *Id.* After additional problems were discovered, "Peizer visited their home again and sent workers several times, but they could not repair the faulty construction of the porch." *Id.*,

*2. The trial court "held there was insufficient evidence to pierce the corporate veil and hold Kenneth Peizer personally liable." *Id.*

{¶ 33} The Eighth District, on the Graysons' appeal from the grant of summary judgment in favor of Peizer, noted that Peizer "was not involved in the contract negotiations for the repair to the Graysons' home. He claims the subcontractors who performed the work at the Graysons' home made all the decisions with respect to the materials used and how to rebuild the Graysons' porch. He met with Dorothy Grayson and asked the main subcontractor * * * to make repairs." *Id.* The court further noted that "Cadillac offered to repair the faulty work, but the Graysons refused." *Id.*

{¶ 34} Regarding Peizer's personal liability for his actions in violation of the OCSPA, the Eighth District noted as follows:

> * * * A corporate officer may be held individually liable for his acts which violate the Consumer Sales Practices Act. [citing *Gayer*, and *Warren Star Theater*]; *State ex rel. Fischer v. Harper* (1993), 83 Ohio App.3d 754 (where corporate officer held personally liable for pyramid sales scheme which he promoted and from which he benefitted). In order to hold a corporate officer personally liable for his actions in violation of the Consumer Sales Practices Act, the evidence must show the officer took part in the commission of the act, specifically directed the particular act to be done, or participated or cooperated therein. *State ex rel. Fisher v. American Courts, Inc.* (July 21, 1994), Cuyahoga App. No. 65939, unreported. [fn] *Id.*, * 3.

{¶ 35} Specifically, the Graysons asserted that Peizer "made deceptive

representations after the transaction between the Graysons and Cadillac Builders in violation of R.C. 1345.02," and that he committed unconscionable sales practices. *Id*., *3-4. After noting that while "proof of intent is not required to prove deception under R.C. 1345.02, proof of knowledge is a requirement to prove an unconscionable act under R.C. 1345.03," the trial court concluded that the Graysons "failed to produce evidence that Peizer acted with knowledge of the unconscionability of his company's work." *Id*., *4. The court further declined to pierce the corporate veil and hold Peizer personally liable for the acts of Cadillac Builders in violating the OCSPA, since the "evidence tends to suggest the company suffered from a lack of control over the quality and workmanship of the subcontractors it hired." *Id*.

{¶ 36} We disagree with the trial court's determination that "CSPA violations by corporate officers should be measured against the veil piercing criteria of *Belvedere and Dombroski"* in this case. As did Kenley and Zawislan, and unlike Peizer, McGarvey, a supplier, in contracting with the Luckoskis, consumers, personally took part in the commission of, or cooperated and directly engaged in, violations of the OCSPA, and he can be held liable for damages that resulted from his violations, regardless of whether or not his actions were "calculated to take advantage of the Luckoskis." In other words, we need not determine whether to pierce the corporate veil, since McGarvey's liability is not based upon his status as a shareholder but upon his direct actions in violating the OCSPA. *See*, *Inserra v. J.E.M. Building Corp.*, 9th Dist. Medina No. 2973-M, 2000 WL 1729480 (Nov. 22, 2000). *See also, Garber v. STS Concrete Co., L.L.C.,* 2013-Ohio-2700, 991 N.E.2d 1225, ¶ 27(8th Dist.)("In certain contexts, * * * individuals can be held to answer for the actions of the company. Violations of the CSPA offer such a context. Where officers or shareholders of

a company take part in or direct the actions of others that constitute a violation of the CSPA, that person may be held individually liable.); *Mohme v. Deaton*, 12th Dist. Warren No. CA2005-12-133, 2006-Ohio-7042 ("the OSCPA does create a tort that imposes personal liability upon corporate officers for violations of the act performed by them in their personal capacities.")

{¶ 37} For the foregoing reasons, the Luckoskis' first assignment of error is sustained.

{¶ 38} The Luckoskis' second assignment of error is as follows:

"THE TRIAL COURT ERRED IN FINDING THAT THE ACTIONS OF A RESTORATION CONTRACTOR WHO HAS NEVER MET THE CONSUMER, HAS NO BUSINESS LOCATION OTHER THAN HIS HOME AND ENTERS INTO CONTRACTS AT THE CONSUMER'S HOME DO NOT COME WITHIN THE OHIO HOME SALES SOLICITATION ACT."

"I. A Defendant Who Comes To A Consumer's Home and Solicits His Business Comes Within the Ohio Home Sales Solicitation Act."

{¶ 39} The Luckoskis assert as follows:

Not only does the case law establish that the home restoration supplier who comes to a plaintiff's home comes within the OHSSA, statutorily any transaction that occurs at a plaintiff's home when a supplier does not have a specific place of business in which he can demonstrate his services or that his product can be viewed, is presumed as a matter of law to fall within the scope of the OHSSA, and the burden is upon the defendant to demonstrate that his

actions do not come within the OHSSA.   See, ORC 1345.25.

{¶ 40}    R.C. 1345.21 provides:

As used in sections 1345.21 to 1345.28 of the Revised Code:

(A) "Home solicitation sale" means a sale of consumer goods or services in which the seller or a person acting for the seller engages in a personal solicitation of the sale at a residence of the buyer, including solicitations in response to or following an invitation by the buyer, and the buyer's agreement or offer to purchase is there given to the seller or a person acting for the seller, or in which the buyer's agreement or offer to purchase is made at a place other than the seller's place of business. * * *.

{¶ 41}   R.C. 1345.25 provides: "Where a sale is made pursuant to negotiations that occur at a place other than the seller's fixed location business establishment where goods or services are offered or exhibited for sale, but the agreement or offer to purchase is signed at a seller's fixed location business establishment, a presumption arises that the sale was a home solicitation sale."

{¶ 42}   We agree with the trial court that this matter is not subject to the OHSSA. McGarvey stated that he was initially dispatched to the Luckoskis' home at the time of the emergency by "Alacrity," which is "a liaison between the insurance company and the contractors, and what * * * Alacrity does is they check your credentials to ensure you have * * * the proper credentials, things like the proper insurance and background checks on * * * your individuals and stuff. * * * ."   In other words, McGarvey's express purpose was not to make a sale but to secure the Luckoskis' residence following the fire.   Regarding his

contract with the Luckoskis, McGarvey denied soliciting their business and testified as follows: "I explain the program, just like Rick Laufer did, and I said, 'Here's what we do; here's the program we have; here's the warranty we have.' And I tell everybody that you can choose your own contractor; you do not have to pick us." Laufer testified that he initially explained to Mr. Luckoski that there was "a program that Allstate had that you explain to the customer that they can use any contractor they want. If they don't have a contractor in mind and they want to use a preferred contractor, then there's the program," which includes multiple contractors from which to choose.

{¶ 43} We agree with the trial court that McGarvey did not engage in a personal solicitation at the Luckoskis' residence but rather offered options pursuant to the program established by Allstate. As the trial court noted, McGarvey "was dispatched" by Alacrity to their residence, and the Luckoskis subsequently elected to have him complete the restoration of their home. There being no merit to the Luckoskis' second assigned error, it is overruled.

{¶ 44} The Luckoskis' third assignment of error is as follows:

THE TRIAL COURT ERRED IN FAILING TO FIND THAT THE PLACEMENT OF A LIEN BY A SUPPLIER UPON A CONSUMER'S PROPERTY THAT WAS FILED BEYOND THE STATUTORY TIME LIMIT, INCLUDED MONIES THAT ARE NOT PERMITTED BY STATUTE TO BE THE BASIS OF A LIEN AND WAS BASED UPON WORK THAT THE TRIAL COURT RULED THE APPELLEE HAD NO RIGHT TO COLLECT VIOLATED THE OHIO CONSUMER SALES PRACTICES ACT AND THE OHIO HOME SALES SOLICITATION ACT.

"I. Where A Supplier Attempts to Collect A Consumer Debt When The Supplier Has Violated The Ohio Consumer Sales Practices Act, It Is A Deceptive Practice And A Violation of Ohio Law."

{¶ 45} The Luckoskis assert that "Appellees continue to refuse to remove the lien and thereby have prevented Appellants from accepting an offer to sell their home." They further request that this Court "remand this matter to the Trial Court with instructions to find that the continuation of the lien upon this property based upon the facts set forth in Appellees' counterclaim is a violation of the OCSPA and order the Appellees to remove the lien."

{¶ 46} The Luckoskis direct our attention in part to Ohio Adm. Code 109:4-3-05(D)(6), which provides: "In any consumer transaction involving the performance of any repair or service it shall be a deceptive act or practice for a supplier to: * * * Charge for any repair or service which has not been authorized by the consumer."

{¶ 47} We cannot conclude, under the facts of this case, that the imposition of the mechanics' lien on the Luckoskis' property is the type of deceptive sales practice that the OCSPA was designed to remedy. The trial court determined that McGarvey Construction's counterclaim for services rendered lacked merit and dismissed it, and it ordered McGarvey and M. Construction to remove their lien in the absence of a legally enforceable claim. This appeal is not the proper avenue to address McGarvey's and M. Construction's alleged ongoing failure to remove the lien and any resulting damage therefrom. Accordingly, the Luckoskis' third assigned error is overruled.

{¶ 48} The Luckoski's fourth assignment of error is as follows:

"THE TRIAL COURT ERRED IN FAILING TO FIND THAT CERTAIN ACTIONS TAKEN BY THE SUPPLIER INVOLVING THE CONTRACTS PRESENTED TO THE CONSUMER VIOLATE THE OHIO CONSUMER SALES PRACTICES ACT AND THE HOME SALES SOLICITATION ACT."

"I. Requiring A Consumer To Waive His Rights by Forcing A Consumer to Enter Into A New Contract Is A Deceptive Act And A Violation Of The Consumer Sales Practices Act."

{¶ 49} The Luckoskis assert that "it is unrefuted that on December 6, 2007, Appellants were informed that unless they entered into a new contract, Appellees would walk off the job." They assert that "[t]his is another issue the trial court failed to address," and that "[a]lthough this issue may be immaterial to Appellant's total damages, Appellants do not wish to waive any issue that may affect their case." The Luckoskis ask us to "remand this case to the Trial Court with a finding that the Trial Court rule that Appellee John McGarvey's acknowledgment that he would walk off the job unless Appellants executed a new contract is sufficient to find a violation of the OCSPA."

{¶ 50} The Luckoskis direct our attention to Ohio Adm. Code 109:4-3-05(D)(1), which provides: "In any consumer transaction involving the performance of any repair or service it shall be a deceptive act or practice for a supplier to: (1) Make the performance of any repair or service contingent upon a consumer's waiver of any rights provided for in this rule."

{¶ 51} As evidence of the alleged violation, the Luckoskis cite the following exchange in Richard Luckoski's direct examination regarding the contract of December 6, 2007 (Plaintiff's Exhibit 40):

Q. Why are you signing a new contract four months after the fire?

A. Because I was informed by Ms. Johnson from Alacrity and John McGarvey standing in my driveway that if I didn't sign these papers, that they would stop, close down, and leave.

Q. Why did you not just do it? Let them leave?

A. I should have.

{¶ 52} Regarding the second contract, McGarvey testified as follows:

\* \* \*

What happens is that it got to the point where with the work orders not being signed and everything else, dealing with Johnetta Johnson through Alacrity, I just kind of said, hey, you know, should we be going back to this place.

That's when she came out to the job site. And this is the time she said, look, we need to get this thing signed or we're not going to have McGarvey stay here. We're not going to continue to work here anymore.

{¶ 53} We note that Exhibit 40 includes a price of \$74,347.78, it allows for an extension of time to complete the work, fails to comply with Ohio Adm. Code 109:4-3-09(A)(1), and provides that the "homeowner agrees to pay in full any and all non-covered repairs/work completed by McGarvey Construction within 30 days of job completion."

{¶ 54} In a Section Entitled "PROPERTY OWNER'S AUTHORIZATION," the following language appears directly above Richard Luckoski's signature: "The Property

Owner hereby: * * * 8. Acknowledges that the Contractor has allowed the Property Owner ample time and opportunity to review this Work Order, and that the Property Owner has in fact read and understands this document in its entirety, including the NOTICE provided below." The notice below indicates the Property Owner's Right to Cancellation "at any time prior to midnight of the third business day after the date of this transaction." The final section of the document, entitled "WAIVER," which provides in part, "* * * I am waiving my right to cancel this transaction within three business days, and am requesting you to begin work immediately," is not executed by Luckoski.

**{¶ 55}** While Exhibit 40 provided the Luckoskis' with a right to cancellation, and McGarvey did not make completion of the restoration contingent upon Richard Luckoski's execution of the waiver in Exhibit 40, we cannot conclude that McGarvey's alleged conduct in informing the Luckoskis that "Appellees would walk off the job" in the absence of a new contract is not a deceptive practice. As this Court has previously noted, "the sole purpose of the [CSPA] is to protect consumers and eradicate deceptive trade practices, which necessarily entails a liberal interpretation of the Act to effectuate the legislative intent." *Wiseman v. Kirkman*, 2d Dist. Darke No. 1575, 2002-Ohio-5384, ¶ 41. Since the trial court did not address the issue of whether or not the Luckoskis established that McGarvey threatened to "walk off the job" in a manner that violated the OCSPA, the fourth assigned error is sustained, and the matter is remanded for the trial court's determination as to whether or not McGarvey committed an additional violation of the OCSPA.

**{¶ 56}** Having sustained the Luckoskis' first and fourth assigned errors, the matter is remanded to the trial court to render judgment in favor of the Luckoskis on their claim

against McGarvey individually, and to determine whether the Luckoskis established that McGarvey violated the OCSPA as set forth above. In all other respects, the judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, P.J. and FROELICH, J., concur.

Copies mailed to:

Terry L. Lewis
Charles Slicer, Sr.
Hon. Michael W. Krumholtz